**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BARBARA J. SIMPSON,            ) | |
|                Plaintiff,            ) | |
|                v.            ) | Civil Action No. 05-138 Erie |
| JO ANNE B. BARNHART,            )
Commissioner of Social Security,            ) | |
|                Defendant.            ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN, J.

     Plaintiff, Barbara J. Simpson, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Simpson filed applications for DIB and SSI on October 2, 2002, alleging disability as of October 19, 2001 due to borderline hypertension, depression, glaucoma, rheumatoid arthritis, and gestational diabetes (Administrative Record, hereinafter "AR", 51-53, 71). Her applications were denied, and she requested a hearing before an administrative law judge ("ALJ") (AR 35-39). Following a hearing held on June 10, 2002, the ALJ found that Simpson was not entitled to a period of disability or disability insurance, and was not eligible for SSI benefits (AR 16-25). Simpson's request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons that follow, we will deny Plaintiff's motion and grant Defendant's motion.

**I. B**ACKGROUND[1]

     Simpson was born on October 22, 1970, and was thirty-three years old at the time of the

---

[1]Simpson does not challenge the ALJ's findings with respect to her physical impairments; therefore, our discussion of the medical evidence is limited to her mental impairments.

ALJ's decision (AR 17, 51). She completed school through the tenth grade and has a general equivalency diploma (GED) (AR 267). She has past relevant work experience as a cashier/stock clerk (AR 267).

Simpson was seen by David Lesseski, D.O., on September 9, 2002 for headache complaints (AR 118). She reported she was under a lot of stress at home, and Dr. Lesseski noted she was somewhat tearful during the examination when discussing her home situation (AR 118). Antidepressant therapy was discussed, and Dr. Lesseski prescribed Celexa since she had difficulty sleeping (AR 118). On November 1, 2002 Simpson reported that her mood had improved only "a little" since beginning the Celexa (AR 242). On December 2, 2002, Dr. Lesseski refilled her Celexa which "seem[ed] to be controlling her symptoms" (AR 241). Dr. Lesseski noted that she was pleasant and in no acute distress, and indicated that perhaps her stress level would decrease since court hearings involving the custody of her daughter were over (AR 241). Simpson reported on December 16, 2002 that she was "definitely doing better" on the Celexa, but she still had mood swings and obsessive compulsive type tendencies (AR 240).

When seen by Bharathi S. Voora, M.D. on December 28, 2002, for a disability examination relative to her physical impairments, Simpson reported that she was depressed (AR 123). Dr. Voora noted she was very tearful in the office, and felt Simpson needed psychiatric or psychological treatment and adjustment of her antidepressant medication (AR 126-127).

Simpson returned to Dr. Lesseski on January 27, 2003, and reported her home situation was worse, her anxiety level was high, and did not feel she was able to work (AR 229). She was encouraged to pursue other avenues to change her home situation (AR 229).

Simpson underwent a clinical psychological disability evaluation conducted by Michael Mercatoris, Ph.D., on March 5, 2003 (AR 144-150). She came to the appointment with her two children and her parents (AR 144). Her children were quite disruptive and noisy, and when asked politely to be quiet, Simpson verbally assaulted the office manager (AR 144). She was "vulgar, blasphemous and threatening" (AR 144). When she came into the examination, Dr. Mercatoris noted her affect was quite labile, she was tearful, and complained about the office manager (AR 144). She reported that she had suffered from depression for over a year (AR 145). She claimed that she was assaulted by her boss at work, had three cousins commit suicide, and

that her nephews were serving a life sentence for murder (AR 145). Her eleven year old daughter was being treated psychologically for anger control problems (AR 145). Simpson denied any inpatient or outpatient psychiatric treatment for herself (AR 145).

On mental status examination, Dr. Mercatoris noted that Simpson's affect was inappropriate and out of proportion to the situation with the office manager (AR 146). Simpson reported that she cried easily, felt helpless, hopeless and worthless, and suffered from insomnia, but had no suicidal ideations (AR 146). Dr. Mercatoris noted she had subjective problems with concentration and memory (AR 146). She denied any auditory disturbances, but reported vague hallucinations (AR 147). Her thought processes were intact and she was able to think in an abstract manner (AR 147). She claimed she checked her locks and made sure her oven was off four to five times during the night, washed her hands five to six times per day, and was afraid of germs (AR 147). Simpson was able to perform single-digit addition, subtraction and multiplication (AR 147). Her memory, retention and recall were intact (AR 148). Her social judgment was variable (AR 148).

Dr. Mercatoris diagnosed Simpson with major depression, recurrent (AR 149). He indicated he would want to rule out the possibility of obsessive-compulsive disorder and panic disorder (AR 149). He was also of the opinion that Simpson had characteristics on Axis II of a personality disorder NOS (not otherwise specified) with borderline features (AR 149).[2] Dr. Mercatoris' psychiatric activities assessment revealed that Simpson was able to engage in activities of daily living, her social functioning was fair, she subjectively stated she would be unable to work as a store manager due to the stressful nature of the job, and she had a poor response to stressful circumstances (AR 149).

Based upon his evaluation of Simpson, Dr. Mercatoris completed a mental capacity assessment form (AR 151-152). He opined that Simpson had a very good ability to understand, remember and carry out simple job instructions; a good ability to follow work rules; relate to co-workers; deal with the public; use judgment; function independently; understand, remember and

---

[2] A "personality disorder not otherwise specified" is the category for disorders of personality functioning that do not meet criteria for any specific personality disorder. *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 729 (4th ed. 2000).

carry out simple job instructions; and maintain personal appearance (AR 151-152). He further opined she would have a fair ability to interact with supervisors; deal with work stresses; understand, remember and carry out complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability (AR 151-152).

On April 3, 2003, Sharon Tarter, Ph.D., a state agency reviewing psychologist, completed a Psychiatric Review Technique form and concluded that Simpson had a mild degree of limitation in her activities of daily living and in maintaining social functioning, a moderate degree of difficulty in maintaining concentration, persistence or pace, and no repeated episodes of decompensation (AR 184). On the same date, Dr. Tarter completed a Mental Residual Functional Capacity Assessment form (AR 188-189). Dr. Tarter concluded that Simpson was not significantly limited in her ability to understand, remember, and carry out very short and simple instructions; understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual; sustain an ordinary routine; work in coordination with others; make simple work-related decisions; interact appropriately with the general public and co-workers; and maintain socially appropriate behavior (AR 188-189). She further concluded that Simpson was only moderately limited in her ability to carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept criticism from supervisors; and respond appropriately to changes in the work setting (AR 188-189).

In making this assessment, Dr. Tarter noted that the medical evidence showed that Simpson was prescribed psychotropic medication by her primary care physician, and she evidenced no impairment of memory function secondary to her impairment (AR 190). Dr. Tarter opined that Simpson could be expected to complete a normal workweek without exacerbation of psychological symptoms, and that she was functional in her activities of daily living and in her social skills (AR 190). She concluded that Simpson remained capable of understanding and remembering instructions, concentrating, interacting with others, and adapting to changes in the workplace, and had no restrictions in her abilities relative to understanding and memory (AR 190). Dr. Tarter adopted and gave "great weight" to Dr. Mercatoris' assessment (AR 190).

Simpson returned to Dr. Lesseski on May 20, 2003 and reported that she was "doing well" on the Zoloft but still had severe mood swings (AR 236). Dr. Lesseski added Neurontin to her medication regime to help stabilize her mood (AR 236).

On July 14, 2003, Simpson reportedly was doing better, although her mood was quite erratic (AR 234). Dr. Lesseski increased her Neurontin dosage (AR 234).

Simpson began psychiatric treatment with Jaime Ayala, M.D., at Community Integration on August 22, 2003 (AR 194-196). She reported severe depression, irritability, anger, poor sleep, obsessive preoccupations with the safety of the house and those in it, and occasional panic attacks (AR 194). Simpson claimed to have suffered from severe child abuse and depression following the birth of her child (AR 194). On mental status examination, she was alert, oriented and maintained good eye contact (AR 195). Dr. Ayala noted that her attention and concentration were "excellent" and her memory was intact (AR 195). Simpson's vocabulary, reading, math and general fund of knowledge appeared adequate (AR 195). She managed her accounts, grocery lists and mail without any problems, and was interested in social activities (AR 195). Dr. Ayala found thought disturbance was present in the form of severe obsessions and compulsions of a repetitive and ego-dystonic nature (AR 195). Her affect was dysphoric with agitation, restlessness, apprehension and hyper-alertness with a constant state of free-floating anxiety and obsessive-compulsive preoccupations (AR 195). Her judgment was fair, her motivation was good, and her ability to benefit from psychotherapy was good (AR 195).

Dr. Ayala diagnosed Simpson with generalized anxiety disorder with panic attacks; obsessive-compulsive disorder; rule-out dysthymic disorder; and rule-out post-traumatic stress disorder (AR 195). He assigned her with a current global assessment of functioning scale ("GAF") of 40 and a GAF for the past year of 60 (AR 195).[3] He recommended individual and

---

[3]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Scores between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ...)." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational,

group psychotherapies, and prescribed Zoloft, Neurontin, Seroquel and Xanax (AR 196).

Medication management progress notes from Community Integration indicated that Simpson was stabilizing on her medications on October 14, 2003 (AR 215). Her behavior was within normal limits and her mood was good (AR 215). Her GAF score was 55 (AR 215). On December 18, 2003, Simpson complained of mood swings, grief over a cousin's death, and increased anxiety and depression (AR 216). She exhibited an irritable mood, but was pleasant and cooperative, and was assigned a GAF score of 50 (AR 216).[4]

On February 4, 2004, Simpson presented as unkempt, irritable and paranoid, but was cooperative (AR 217). She complained of trouble controlling her anger, mood instability, irritability and impulsive "snapping" bordering fits of rage (AR 217). She claimed she entertained passive homicidal ideations towards "stupid people," but denied suicidal ideations (AR 217). She was tapered off Neurontin and place on Depakote for her mood and anger, and was assigned a GAF score of 45 (AR 217).

On February 5, 2004, Lynn Taylor, a Physician's Assistant with Community Integration, indicated that Simpson was psychiatrically unstable and suffering from mood instability, depression, anxiety, anger dyscontrol and periods of hypomania (AR 193). Ms. Taylor was of the opinion that Simpson was disabled, and strongly recommended that she not work because she believed Simpson would not be able to conduct herself appropriately in any work related setting (AR 193). She further opined that stressors related to even part-time work could trigger undesirable and impulsive behavior (AR 193).

On February 18, 2004, Simpson presented to Community Integration as organized, and denied any homicidal or suicidal ideations (AR 218). Her Xanax was decreased and the Seroquel was increased (AR 218). Her GAF score was 50 (AR 218).

On April 13, 2004, Simpson's appearance, behavior, mood/affect and cognition were reported as within normal limits (AR 219). She complained of hives from the medication and

---

or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

[4]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job.)" *Id.*

poor sleep (AR 219). She was assigned a GAF score of 45 (AR 219).

Simpson returned to Dr. Lesseski on April 16, 2004, who reported that she was in good spirits, and was doing very well with her mood and anxiety (AR 228).

Finally, when seen at Community Integration on April 27, 2004, Simpson complained of migraines (AR 220). Her appearance, behavior, mood/affect and cognition were all within normal limits, but she was assigned a GAF score of 40 (AR 220).

Simpson and William Reed, a vocational expert, testified at the hearing held by the ALJ on June 8, 2004 (AR 259-291). Simpson testified that she took Xanax, Seroquel, Zoloft and Topamax for her mental impairments (AR 265). She saw a therapist at Community Integration approximately once a month, and saw Dr. Ayala approximately twice a month (AR 266-267). She stopped working in October 2001and received unemployment compensation for a period of time (AR 269, 271). She claimed her mother drove the children to school and performed her household chores (AR 271). Simpson testified that she was unable to work because of migraines and the side effects of the Topamax (AR 273-274).

Simpson further testified that she suffered from crying spells and had a bad temper (AR 282-283). She claimed she had been "kicked out" of stores for yelling at people who corrected her children's behavior (AR 284). She also yelled at people in other cars while her mom was driving (AR 284). She further claimed she had problems with co-workers and supervisors (AR 284).

The ALJ asked the vocational expert if work existed for an individual of Simpson's age, education and past work experience, who was limited to medium work that involved short, simple instructions, with no intensive supervision or changes in the work setting, who should avoid close contact with co-workers, interaction with the public, decision-making and competitive production pace (AR 287-288). The vocational expert testified that such an individual could perform work as a hotel maid (AR 289).

Following the hearing, the ALJ found that Simpson was not entitled to a period of disability or disability insurance, and was not eligible for SSI benefits (AR 16-25). Her request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-8). She subsequently filed this civil action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that her disability existed before the expiration of her insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Simpson met the disability insured status requirements of the Act on October 19, 2001, the date she stated she became unable to work (AR 24). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical

8

> impairment, the [Commissioner] determines (3) whether the
> impairment is equivalent to an impairment listed by the
> [Commissioner] as creating a presumption of disability. *Bowen,*
> 482 U.S. at 141. If it is not, the claimant bears the burden of
> showing (4) that the impairment prevents him from performing the
> work that he has performed in the past. *Id.* If the claimant satisfies
> this burden, the [Commissioner] must grant the claimant benefits
> unless the [Commissioner] can demonstrate (5) that there are jobs
> in the national economy that the claimant can perform. *Ferguson
> v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ resolved Simpson's case at the fifth step. At step two, the ALJ determined that Simpson's major depression was a severe impairment, but determined at step three that she did not meet a listing (AR 20). At step four, the ALJ found she had the residual functional capacity ("RFC") to perform medium work that involved simple instructions and basic decisions, with no intensive supervision, major workplace changes, close contact with co-workers or the public, or competitive pace of production (AR 24). At the final step, the ALJ determined that Simpson could perform the job cited by the vocational expert at the administrative hearing (AR 25). The ALJ additionally determined that Simpson's statements concerning her impairments and their impact on her ability to work were not credible (AR 24). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Simpson first challenges the ALJ's analysis at step three of the sequential evaluation process. 20 C.F.R., Pt. 404, Subpt. P., Appendix 1 contains a list of various impairments that the Commissioner has determined prevent a person from performing any work. 20 C.F.R. §§ 404.1525, 416.925. A claimant who meets or medically equals all of the criteria of an impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Commissioner*, 220 F.3d 112, 119 (3rd Cir. 2000). A claimant bears the burden of proving that her impairments meet or equal a listed impairment. *See Adorno v. Shalala,* 40 F.3d 43, 46 (3rd Cir. 1994).

In determining whether Simpson met a listing at step three relative to her mental impairment, the ALJ examined the medical evidence of record and concluded that while her mental disorder was severe since her abilities to sustain concentration, engage in close personal interactions, and manage stress were limited, it was not shown to have been consistent with the

9

requirements of 12.04 for any continuous period of a year or more (AR 20). He concluded that Simpson was no more than mildly limited in the ability to handle activities of daily living, moderately limited in social interactions and concentration, pace and persistence, and unlikely to decompensate if exposed to the stresses associated with ordinary skilled work (AR 20). In concluding that Simpson did not meet a listing, he accorded "great weight" to the findings of Dr. Tarter, a state agency psychologist, that her overall degree of impairment was not medically equivalent to the listing criteria (AR 20).

Simpson argues that the ALJ's reliance on Social Security Ruling ("SSR") 96-6p in according great weight to Dr. Tarter's opinion was in error. SSR 96-6p discusses the import of medical reports authored by state agency medical consultants. In pertinent part, SSR 96-6p provides:

. . .

> State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act. As members of the teams that make determinations of disability at the initial and reconsideration levels of the administrative review process (except in disability hearings), they consider the medical evidence in disability cases and make findings of fact on the medical issues, including, but not limited to, ... whether the individual's impairment(s) meets or is equivalent in severity to the requirements for any impairment listed in 20 CFR part 404, subpart P, appendix 1 ... .

. . .

> The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled. As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments. However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

. . .

*SSR 96-6p,* 1996 WL 374180 at *2-3.

In the instant case, Dr. Tarter concluded that Simpson's impairment was not medically equivalent to the listing criteria, in that she only had a mild degree of limitation in her activities of daily living and in maintaining social functioning, a moderate degree of difficulty in maintaining concentration, persistence or pace, and no repeated episodes of decompensation (AR 184).

Simpson claims that the ALJ's reliance on Dr. Tarter's opinion was improper because she did not have available the consultative examination performed by Dr. Voora, the statement from Ms. Taylor, and the psychiatric evaluation and treatment notes from Dr. Ayala. As Simpson points out, *SSR* 96-6p provides that the opinions of state agency consultants are given weight only insofar as their opinions remain supportable in light of evidence which was not before the state agency. *SSR* 96-6p, 1996 WL 374180 at *2. Although her argument is somewhat unclear, it appears she contests the weight the ALJ accorded to Dr. Tarter's opinion in light of the additional medical evidence.

We find nothing in *SSR* 96-6p that requires a different outcome of this claim at step three of the evaluation process. The records of the treating and examining physicians do not support Simpson's contention that her mental impairment prevented her from performing substantial gainful activity. To fall within the listed impairment of 12.04, a claimant must meet Part A, which is a set of medical findings, and either Part B or C, which are sets of impairment-related functional limitations. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. It is undisputed that Simpson met the Part A criteria; the issue is whether the subsequent evidence demonstrated that she met Part B.[5] The listing requires that the claimant offer evidence of at least two of the four following

---

[5]There is no evidence in the record to support a finding that the Part C criteria were met, which requires:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or

restrictions: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.04B.  "Marked" means more than moderate but less than extreme. *See* 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.00C.

There is no question that Simpson's records demonstrate some deficiencies in concentration, persistence or pace.  However, the evidence with respect to categories one, two and three do not demonstrate deficiencies which would rise to the level of a marked limitation. For example, when seen by Dr. Ayala in August 2003, he found she had only moderate mental health symptoms for the previous twelve months preceding her evaluation (AR 195).  Dr. Mercatoris found that she was able to engage in activities of daily living, and Simpson herself reported to Dr. Ayala that she was able to manage her accounts, grocery lists and mail without any problems, and was interested in social activities.  (AR 149, 195).  Community Integration treatment notes reflect that while she experienced some symptoms with respect to her mental impairment, overall her mood/affect and cognition were within normal limits (AR 219, 220). When last seen by Dr. Lesseski in April 2004, she was in good spirits and doing very well with her mood and anxiety (AR 228).  Finally, there are no reported repeated episodes of decompensation of an extended duration.

We recognize that Ms. Taylor, a physicians' assistant with Community Integration, opined in February 2004 that Simpson was disabled.  However, Ms. Taylor, as a physicians' assistant, is not an "acceptable medical source" whose opinion is entitled to controlling weight. *See* 20 C.F.R. §§ 404.515(a); 416.913(a); *see also Hartranft v. Apfel,* 181 F.3d 358, 361 (3rd Cir.

---

> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, Appx. 1, 12.04C.

1999) (holding chiropractor's opinion not entitled to controlling weight under treating physician rule). Moreover, as observed by the ALJ in fashioning Simpson's residual functional capacity, ("RFC"), her opinion is devoid of any specific work functions Simpson is incapable of performing. Therefore, her opinion lends no support that Simpson meets a listing.

In sum, we conclude that the ALJ did not give undue weight to Dr. Tarter's assessment inconsistent with *SSR* 96-6p, and that his decision to credit Dr. Tarter's findings was supported by substantial evidence.

Simpson's next argument is that the term "fair" as utilized by Dr. Mercatoris in his assessment of her mental RFC supports a finding of disability. Dr. Mercatoris concluded that with respect to Simpson's abilities in making occupational and performance adjustments, she had a "fair" ability to interact with supervisors, deal with work stresses, and understand, remember and carry out complex job instructions (AR 151).[6] As Simpson points out (and the Commissioner does not dispute), the Medical Assessment form completed by Dr. Mercatoris defined the term "fair" as follows: "[a]bility to function in this area is seriously limited, but not precluded." *Plaintiff's Brief, Attachment C*.[7] Simpson complains that the ALJ failed to consider Dr. Mercatoris' findings that she had a "fair" ability in areas related to making occupational and performance adjustments, in light of the definition of the term "fair" as set forth in his consultative report. Simpson suggests that a "fair" limitation means that an individual is not capable of performing the ability appropriately, effectively, and on a sustained basis. We disagree. First, the Medical Assessment form completed by Dr. Mercatoris indicated that his assessment was based upon Simpson's ability to do work-related activities on a day-to-day basis in a regular work setting. *See Plaintiff's Brief, Attachment C.* Therefore, Dr. Mercatoris'

---

[6]Dr. Mercatoris further concluded that in making personal and social adjustments, she had a "fair" ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability (AR 152).

[7]Simpson attached to her brief a sample copy of page 5 of the medical assessment form generated by the state Bureau of Disability Determination, which contains the relevant definitions and explains the rating system. This form was not included within the administrative record; however, Simpson assumes, and the Commissioner has not disputed, that the same form was sent to Dr. Mercatoris who relied upon the definitions when completing the form.

13

opinion as to Simpson's ability to make adjustments established that although she was seriously limited in some areas, she was in fact not precluded from performing these abilities on a day-to-day basis in a regular work setting. In any event, the ALJ considered the fact that she was limited in these areas by restricting her to work involving simple instructions and basic decisions, with no intensive supervision, major workplace changes, close contact with co-workers or the public, or competitive pace of production (AR 24). Therefore, we find no error in this regard.[8]

Simpson's related argument with respect to Dr. Tarter's assessment gets no further. Dr. Tarter found that Simpson was "moderately limited" in her ability to carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting (AR 188-189). "Moderately limited" is defined as "evidence [which] supports the conclusion that the individual's capacity to perform the activity is impaired." *See Plaintiff's Brief, Attachment B.*[9] Simpson claims that Dr. Tarter's ultimate conclusion that she has the ability to meet the demands of competitive work on a sustained basis is inconsistent with her own RFC findings, and contradictory to Dr. Mercatoris' findings, which she adopted.

Dr. Tarter rated Simpson as "moderately limited," (i.e., impaired) in certain areas, but concluded that she could still be expected to complete a normal workweek without exacerbation of psychological symptoms, and remained capable of understanding and remembering

---

[8]In her Reply Brief, Simpson cites to our recent decision in *Eggleston v. Barnhart,* Civil Action 05-84 (W.D.Pa. Sept. 30, 2005) (unpublished) as further support for her argument. In *Eggleston*, the state agency consulting examiner rated the plaintiff "fair" in ten out of fifteen categories on the medical assessment form. We noted that these "fair" ratings suggested a level of performance that was less than satisfactory which were significant in assessing the plaintiff's RFC. We remanded the case to the Commissioner because we were not satisfied that all of plaintiff's relevant impairment-related limitations were adequately reflected in the ALJ's hypothetical question to the vocational expert. The instant case is distinguishable however, since the ALJ here specifically included the limitations encompassed by Dr. Mercatoris' "fair" ratings in his hypothetical to the vocational expert.

[9]Again, this information was not included in the administrative record, but the Commissioner has not disputed that this definition would have been utilized by Dr. Tarter in evaluating Simpson's mental RFC.

instructions, concentrating, interacting with others, and adapting to changes in the workplace (AR 190). We do not view Dr. Tarter's conclusions as inconsistent with her ratings, particularly in light of the corresponding instructions under the definition of the term "moderately limited." As set forth under the definition, the state agency physician or psychologist is required to describe the degree and extent of the claimant's limitation in connection with such a rating. *See Plaintiff's Brief, Attachment B*. When the instructions are read as a whole and in full context, it is apparent that while Dr. Tarter considered Simpson to be "impaired" in certain areas, the degree and extent of her limitations were not such that she was precluded from working.

We further reject Simpson's contention that Dr. Tarter's assessment was contradictory to Dr. Mercatoris' assessment. Although the same rating system was not utilized, *both* psychologist's found limitations in Simpson's ability to deal with work stresses, interact with supervisors, and carry out detailed or complex instructions (AR 151, 188-189). We do not view these findings as contradictory. In any event, as noted previously, the ALJ's RFC determination expressly accounted for Simpson's deficiencies in these areas due to her mental condition.

Finally, Simpson challenges the ALJ's credibility determination. She contends that the ALJ's credibility finding is based on speculation with respect to her daily activities and her receipt of unemployment compensation benefits after her alleged onset date. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983). In his assessment of Simpson's credibility, the ALJ found that her statements concerning her impairments and their impact on her ability to work were not credible.

We find no error in the ALJ's credibility assessment. Contrary to Simpson's argument, the ALJ gave numerous reasons in support of his credibility determination consistent with the

above standard. The ALJ noted that due to her sporadic work history, it would be unreasonable to assume she would be working even if no impairment existed (AR 21). He also observed that Simpson claimed to have impairments which she did not have (AR 21). She did not begin treatment for her alleged mental impairment until just before she filed her disability claim, and she never received inpatient treatment for her alleged physical and mental disorders (AR 21). The ALJ further noted that Simpson claimed she relied on her daughter for the more demanding activities of daily living, yet her daughter was disabled, which demonstrated that her statements were calculated to produce an exaggerated picture of her condition (AR 21). Finally, the ALJ observed that she received unemployment compensation after her alleged onset date (AR 21). All of these findings are substantiated by the record, and the ALJ was not required to accept Simpson's assertions that her mental impairment was completely debilitating. We therefore find that there was substantial evidence in the record, taken as a whole, to support the ALJ's credibility determination.

## IV. CONCLUSION

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA J. SIMPSON, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-138 Erie |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER

AND NOW, this 18th day of November, 2005, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 9] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 11] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Barbara J. Simpson.  The clerk is directed to mark the case closed.

                                                    s/ Sean J. McLaughlin
                                                    United States District Judge

cm: All parties of record.